IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NINESPOT, INC.,

        Plaintiff,

v.

JUPAI HOLDINGS LIMITED, PUJI MEDIA
HOLDINGS LIMITED, PUJI JUPAI ASSET
MANAGEMENT,

        Defendants.

Civil Action No. 18-144-RGA

<u>MEMORANDUM ORDER</u>

Presently before this Court are motions to dismiss filed by Defendants Jupai Holdings Limited ("Jupai") (D.I. 80), Puji Media Holdings Limited ("Puji") (D.I. 79), and Puji Jupai Asset Management ("PJ") (D.I. 77). The motions to dismiss are based on Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 9(b). The matter is fully briefed. (D.I. 78, 81, 82, 88, 90, 91, 94). The Court heard oral argument on June 28, 2018. (D.I. 101).

For the reasons set forth herein, Defendants' motions are granted in part and denied in part.

## I.  BACKGROUND

On October 10, 2017, Plaintiff Ninespot filed this action against Jupai, Puji, and PJ for breach of contract and related claims in connection with a potential investment by Jupai in Ninespot. (D.I. 1). Plaintiff was an online and livestream video platform creator, incorporated in Delaware with its principal place of business in California. (*Id.* at 3). In 2015, Plaintiff's Chief Executive Officer and Chairman met with the Vice President of Puji in California to discuss a collaboration between the two parties. (*Id.* ¶ 18). After months of communication, Plaintiff and Puji executed a Business Collaboration Agreement

that laid out terms discussing Puji's proposed assistance to Plaintiff in creating strategic partnerships, expanding Plaintiff's products, and securing investment capital in the Asian market. (*Id.* ¶¶ 24-26). Puji then introduced Jupai to Plaintiff as a potential investor in Plaintiff's business, relying on Puji's close working relationship with Jupai to assist with the proposed investment. (*Id.* ¶¶ 30-31). Executives from both Puji and Jupai negotiated terms for the proposed investment in Plaintiff in exchange for a number of shares of stock from Plaintiff, executed in a non-binding term sheet, signed by Plaintiff and stamped by Jupai. (*Id.* ¶¶ 53-54).[1]

Further negotiations were conducted by Puji, on behalf of Jupai, regarding additional equity structured into the proposed investment deal. (*Id.* ¶¶ 55-56). In December 2016, a draft of a Series B Stock Purchase Agreement was sent from Plaintiff to Puji, incorporating the terms by which Plaintiff and Jupai agreed to execute the planned investment. (*Id.* ¶ 58). Puji continued to request changes to the draft of the Stock Purchase Agreement and in April, 2017, Plaintiff and PJ executed the Series B Stock Purchase Agreement, with terms including the number of shares to be purchased by PJ for its investment of $18 million in Plaintiff. (*Id.* ¶¶ 92-93). Up until approximately May, 2017, Puji, on behalf of Jupai's designated offshore investing entity, PJ, represented to Plaintiff that Jupai was prepared to make the investment. (*Id.* ¶ 98).[2] By June of 2017, the investment had not been received, and Plaintiff sent a demand letter through its counsel to Jupai seeking assurance that Jupai had attempted in good faith to fund the first installment of the investment. (*Id.* ¶ 105). Plaintiff received a response from PJ, which disclaimed all contractual obligations from any agreement formed in connection with the proposed

---

[1] Gordon Chu, Vice President at Puji, served as the contact to Plaintiff on behalf of Jupai and Puji in all communications regarding formation and negotiation of the various agreements prepared for execution of the proposed investment. (D.I. 1).
[2] One of Plaintiff's claims, Count Six, is filed against Puji for intentional interference with prospective economic relations. It is based on allegations that when Puji represented to Plaintiff that Jupai was willing to move forward with the investment in Plaintiff, Puji represented to a potential acquisition target of Plaintiff that the investment was moving slowly and that business agreements with Plaintiff may not be fruitful. (*Id.* ¶ 48).

investment, stated the Chinese government's tightened restrictions on the outbound flow of investment capital from China prevented PJ from wiring the money, which constituted an unforeseeable and uncontrollable *force majeure*, and declared PJ would cease all efforts on the investment. (*Id.* ¶¶ 107-08).[3]

Plaintiff's complaint alleges the failure to invest and related claims have effectively rendered Plaintiff's business worthless. Plaintiff seeks to recover damages accordingly. (*Id.* ¶ 118).

## II. LEGAL STANDARDS

### a. Rule 12(b)(2)

When reviewing a motion to dismiss pursuant to Rule 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003). "Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction." *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff must produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside of the pleadings." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984).

The personal jurisdiction analysis involves both a statutory and constitutional inquiry. *Shoemaker v. McConnell*, 556 F. Supp. 2d 351, 354 (D. Del. 2008). First, the court must consider whether a defendant's actions come within any of the provisions of the state long-arm statute. *See Intel v. Broadcom*, 167 F. Supp. 2d 692, 700 (D. Del. 2001). Second, the court must determine whether

---

[3] The demand letter sent from Plaintiff was addressed to Jupai, and Oreans Yuan, Puji's Chief Financial Officer, sent the response to Plaintiff, responding in his capacity as Director of PJ. (*Id.* ¶ 107).

exercising jurisdiction over the defendant in the forum comports with the Due Process Clause of the

Constitution. *Id.*

The court applies the law of the state in which the district court is located. *See id.* Delaware's

long-arm statute authorizes jurisdiction over a nonresident when, among other things, that party or its

agent:

> (1) Transacts any business or performs any character of work or service in the State; (2) Contracts to supply services or things in this State; (3) Causes tortious injury in the State by an act or omission in this State; (4) Causes tortious injury in the State or outside the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. . . .

10 Del. C. § 3104(c)(1)–(4). "With the exception of (c)(4), the long-arm statute requires a showing of

specific jurisdiction." *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 622 (D. Del. 2015).

Subsection (c)(4), on the other hand, confers general jurisdiction, such that while a general presence in

Delaware is necessary to assert jurisdiction, the contacts of the nonresident (or its agent) need not relate

to the instant litigation. *See Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 505 (D. Del. 2003).

The court should interpret the language of these provisions liberally, as "conferring jurisdiction to the

maximum extent of the Due Process clause." *Jeffreys v. Exten*, 784 F. Supp. 146, 151 (D. Del. 1992).

Further, the Delaware long-arm statute is a "single act" statute, whereby even one transaction engaged in

by the nonresident in Delaware establishes jurisdiction. *Eudaily v. Harmon*, 420 A.2d 1175, 1180 (Del.

1980).

Due Process is satisfied if the court finds the existence of "minimum contacts" between the

nonresident defendant and the forum state, "such that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S.

310, 316 (1945) (internal quotation marks omitted).

### b. Rules 12(b)(6) and 9(b)

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the complaint's factual allegations as true.[4] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 555. The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

Federal Rule of Civil Procedure 9(b) requires that a complaint must state with particularity the circumstances constituting fraud or mistake. Conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b). Complaints that fail to plead fraud or false claims grounded in fraud with the requisite particularity are dismissed in the same manner as a dismissal under rule 12(b)(6). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).

### III. DISCUSSION

Jupai makes two principal arguments in its motion to dismiss. First, it argues Delaware courts lack personal jurisdiction over Jupai because it was not a signatory to the agreement that contained a

---

[4] There is no question that I can consider, in addition to the complaint, the various purported contracts and agreements that form the basis for the claims. *See Lum v. Bank of America*, 361 F.3d 217, 221 n. 3 (3d Cir. 2004).

Delaware forum selection clause. (D.I. 81 at 3). Second, it argues Plaintiff has failed to state a claim in the five counts in which it is a defendant. (*Id.* at 1). Puji and PJ, in their motions to dismiss, argue the counts in which they are defendants fail to state a claim. (D.I. 77, 79). Puji also relies on Rule 9(b) for its argument. (D.I. 79).

### a. Jupai's 12(b)(2) motion to dismiss

Jupai moves the Court to dismiss it for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The case was filed in California. The District Court there transferred the case here on motion of the other two defendants. Plaintiff argues that this Court can exercise jurisdiction over Jupai based on the California court's decision in its grant of the motion to transfer. That court held that Jupai consented to jurisdiction in Delaware because it was "closely related" to the Stock Purchase Agreement that contained the Delaware forum selection clause. (D.I. 88 at 4).

In order to determine if Jupai is subject to personal jurisdiction in Delaware, the main issue is whether Jupai is bound by the Delaware forum selection clause. When a party is bound by a forum selection clause, the party consents to personal jurisdiction. *Hadley v. Shaffer*, 2003 WL 21960406, at *3 (D. Del. Aug. 12, 2003); *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F.Supp.2d 423, 431 (D. Del. 1999)). Further, express consent to jurisdiction, like that found from a party bound by a forum selection clause, satisfies the requirement of due process owed in a personal jurisdiction inquiry, and thus the minimum contacts analysis becomes superfluous. *Hadley*, 2003 WL 21960406, at *3 (finding "[s]uch consent is deemed to be a waiver of any objection on Due Process grounds and an analysis of minimum contacts becomes unnecessary.").

In accordance with Delaware law, a three-part test is used to determine if a non-signatory party is bound by a forum selection clause. First, is the forum selection clause valid? Second, is the challenging

6

party a third-party beneficiary or "closely related" to the agreement? Third, do the claims at issue arise from the non-signatory's standing relative to the agreement? *Hadley*, 2003 WL 21960406, at \*4; *Aviation West Charters, LLC v. Freer*, 2015 WL 5138285, at \*4 (Del. Super. Ct. July 2, 2015). If each of the answers to the three-part test is affirmative, then the party is bound by the forum selection clause. *Aviation West Charters, LLC*, 2015 WL 5138285, at \*4.

Forum selection clauses carry a high degree of presumed validity. Jupai has not challenged the validity of the forum selection clause in its motion to dismiss. (D.I. 81 at 16-20). Thus, the forum selection clause in the Stock Purchase Agreement is presumed valid.

Jupai challenges the last two prongs of the forum selection clause test, by arguing it is not closely related to the Stock Purchase Agreement such that it could be bound by the forum selection clause. (*Id.*). Specifically, Jupai argues the transferring court made a factual error when it found Jupai was closely related to the agreement. (*Id.* at 17.) Second, Jupai argues that Plaintiff's claims against it do not arise out of the Stock Purchase Agreement, but from a different agreement, the Term Sheet. (*Id.*; *see* D.I. 1 ¶¶ 131-36). The Term Sheet does not contain a Delaware forum selection clause. (D.I. 31, Exh. 1).

I disagree with Jupai on both points. In order to be considered "closely related" to an agreement as a non-signatory, a party "must receive a direct monetary or non-monetary benefit from the agreement." *Phunware, Inc. v. Excelmind Group Ltd.*, 117 F.Supp.3d 613, 630 (D. Del. 2015) (emphasis omitted); *Capital Group Co. Inc. v. Armour,* 2004 WL 2521295, at \*6 n. 40 (Del. Ch. Oct. 29, 2004). In addition, Delaware Courts also consider whether it was foreseeable to the party that it would be bound by the agreement. *Aviation West Charters, LLC*, 2015 WL 5138285, at \*4.

First, Jupai argues the California court read the Side Letter Agreement (D.I. 1-3, Exh. C) to bind Jupai to the agreement as the Letter states, "Jupai and its Affiliates shall purchase additional Shares of

7

Series B Preferred Stock ... in accordance with Section 1.1(c) of the Stock Purchase Agreement." (*Id.*)

Jupai argues this reading of the letter is incorrect, because the Stock Purchase Agreement defines

"Jupai" to mean "Puji Jupai Asset Management," or PJ. (D.I. 1-2, Exh. B). Jupai argues the California

court "relied heavily on the Side Letter Agreement" to find that Jupai is bound to the Stock Purchase

Agreement. (D.I. 81 at 17). But the Side Letter Agreement was only part of the analysis. The California

court's order first specifies that Jupai is closely related to the Stock Purchase agreement because Jupai

was party to the Term Sheet. (D.I. 52 at 5). The relevant provision of the Term Sheet provided that Jupai

itself would invest in Plaintiff pursuant to the terms of the Stock Purchase Agreement. (D.I. 31, Exh. 1 at

2). Second, the California court premised its decision on the fact that Jupai "negotiated the specific

terms of the [Stock Purchase Agreement], including that the investment be structured in tranches to

accommodate Jupai's concerns about capital outflow." (*Id.*) Third, the California court decided Jupai

was closely related based on its involvement in the Side Letter Agreement. (*Id.*) Thus, even if the

California court did mistakenly interpret "Jupai" in the Side Letter Agreement to signify "Jupai Holdings

Ltd." rather than PJ, Jupai can still be found to be closely related through the two other above-mentioned

connections to the Stock Purchase Agreement.[5]

    While Jupai was not a named party nor signatory to the Stock Purchase Agreement, Jupai was

involved in the planning and negotiation of the Stock Purchase Agreement to such a degree that it could

expect to be bound by the agreement. It was Jupai's deal.

    Throughout the negotiations and up until the last minute before the execution of the Stock

Purchase Agreement, communicating through Puji, Jupai requested changes be made to the terms of the

---

[5] I do not think the California court was wrong. The Side Letter Agreement says "Jupai and its Affiliates." "Affiliates" is a defined term in the Stock Purchase Agreement. (D.I. 1-2, Exh. B, 31, 4(a)). Thus, even if Defendant Jupai is not the "Jupai" of the Side Letter Agreement, it is an affiliate of the "Jupai" of the Side Letter Agreement.

Stock Purchase Agreement, such as the structuring of tranche investments, and the inclusion of a liability disclaimer clause. (D.I. 1 ¶¶ 80, 89). One month before the Stock Purchase Agreement was executed, Plaintiff and a Jupai attorney, Jinchang Wang (sometimes referred to as "Augusto"), directly communicated via email regarding the logistics of the investment. The Jupai attorney referred to the investment as "our preliminary agreement." The Jupai attorney advised Plaintiff to reach out to Puji or "myself with any questions." (D.I. 41, Exh. 1).

PJ was the designated entity to deliver the investment to Plaintiff in exchange for shares in Plaintiff. But it was Jupai who raised the capital for the investment. It was Jupai who agreed to fund the investment. It was Jupai who requested allocation of additional shares of Plaintiff to be given to Probanca Advisory Limited, a British Virgins Island corporation, which would then be distributed between Jupai and Puji to cover fees associated with the investment. (D.I. 1 ¶¶ 55, 80). Though Jupai was not set to receive Plaintiff's shares directly from Plaintiff from the execution of the Stock Purchase Agreement, Jupai's request to have Plaintiff allocate shares to Probanca, to then be distributed to Jupai and Puji, was functionally identical because Jupai was still set to receive a benefit from the execution of the Stock Purchase Agreement. (D.I. 1 ¶ 55; D.I. 101 at 23-24).

Thus, in accordance with the court's reasoning in *Hadley* and *Aviation West*, Jupai stood to receive the direct benefit of shares in Plaintiff from the completion of the Stock Purchase Agreement. (D.I. 1). The receipt of a direct benefit makes Jupai "closely related" to the Stock Purchase Agreement. *Hadley*, 2003 WL 21960406, at *5; *Aviation West*, 2015 WL 5138285, at *4.

Jupai argues its separate corporate existence from PJ, the signatory on the Stock Purchase Agreement, and its inaction after the execution of the Stock Purchase Agreement preclude it from being closely related to the agreement. *CompuCom Sys., Inc. v. Getronics Fin. Holdings B.V.*, 2012 WL

9

4963308, at *2 (D. Del. Oct. 16, 2012) (noting principle that non-signatories that maintain separate corporate existence throughout the course of the transaction are not closely related to the agreement); *Phunware*, 117 F.Supp.3d at 629 (holding that "the evaluation of when a party is 'closely related' to a contract turns on the party's actions after the contract was executed...."). I find both of these arguments unpersuasive.

First, *CompuCom* found a non-signatory party that maintained the formality of separate corporate existence but was a "driving force" behind the transaction in suit, to be "closely related" to an agreement. *CompuCom*, 2012 WL 4963308, at *4. Rather than Jupai and PJ being two entirely separate and independent corporate entities, as Jupai argues, the relationship between Jupai and PJ was similar to that of the parties in *CompuCom*. In communications between Plaintiff and PJ, officials from Jupai were often copied on emails or communicated directly with Plaintiff. (D.I. 1 ¶¶ 78, 107). Jupai, through Puji's point person, was the party that made all the requests for changes to the Stock Purchase Agreement. (D.I. 1 ¶ 89). Jupai could fairly be considered a "driving force" behind the execution of the Stock Purchase Agreement.

Second, while Delaware case law provides that whether a non-signatory is closely related to an agreement depends on the non-signatory's actions after the execution of the agreement, this does not allow Jupai to deny the close relationship. One month after the execution of the Stock Purchase Agreement, Puji's point person represented to Plaintiff that Jupai's first attempt to wire the money was rejected, and that Jupai and Puji both were seeking alternate routes to fund the investment. (D.I. 1 ¶ 98). Regardless of whether Jupai attempted to wire the money at all or Jupai requested the representation be made, it is evident all parties understood the completion of the terms of the Stock Purchase Agreement to depend on Jupai wiring the money to Plaintiff.

Finally, some of Plaintiff's claims against Jupai are based on Jupai's involvement in the Stock Purchase Agreement. Plaintiff alleges that "Jupai's conduct, as set forth herein, prevented [PJ] from performing its obligations under the [Stock Purchase Agreement]." (D.I. 1 ¶ 146). Plaintiff further alleges "each of the Defendants made false representations ... concerning ... the status of the investment into [Plaintiff] and Jupai's and/or [PJ]'s willingness and ability to fund the investment." (D.I. 1 ¶ 162). Of the five claims against Jupai, three claims, Counts Five, Eight, and Nine, are based on the Stock Purchase Agreement.

Plaintiff orally raised the additional argument that Jupai is subject to personal jurisdiction in Delaware on the basis of Counts Three and Four, relating to breach of the Term Sheet. (D.I. 101 at 28). Plaintiff argues Jupai is subject to jurisdiction here because Jupai entered into a contract with Plaintiff, a Delaware corporation, and subsequently harmed the Delaware corporation by breaching the contract. *Id.* Plaintiff did not cite to the Delaware Long-Arm Statute. I reject this argument as a basis for personal jurisdiction because the Delaware Long-Arm Statute does not provide for jurisdiction over defendants who enter into a contract with a Delaware corporation and subsequently cause harm by breaching the contract, when the harm does not occur in the state. 10 Del.C. § 3104(c)(2).

Thus, it is my opinion that Jupai is bound by the Delaware forum selection clause in the Stock Purchase Agreement, and therefore is subject to personal jurisdiction in the State of Delaware. I will deny Jupai's motion to dismiss pursuant to Rule 12(b)(2).

### b.  Defendants' Rule 12(b)(6) motions to dismiss

Puji, Jupai, and PJ all move to dismiss each of Plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim. I will analyze each count in order to determine whether Plaintiff has sufficiently stated a claim.

## A. Count One against Puji for breach of contract

Count One is based on Puji's breach of the Business Collaboration Agreement, (D.I. 1-1, Exh. A). The Business Collaboration Agreement is governed by California law. (D.I. 1-1, Exh. A at 4). Puji moves to dismiss, arguing the Business Collaboration Agreement does not form a binding or enforceable contract and thus cannot be breached. (*Id.*)

Puji argues there is no consideration in the Business Collaboration Agreement, or, alternatively, any consideration is illusory. (*Id.*) The terms of the Business Collaboration Agreement provide that in exchange for Puji's assistance and advice in connection with expanding Plaintiff's business in China, Puji would be compensated with a number of shares of Plaintiff's common stock. (D.I. 1-1, Exh. 1 at 2-3). Puji points, however, to provisions in the agreement that specify that the issuance of stock to Puji is subject to approval from Plaintiff's Board of Directors and the execution of a Restricted Stock Award Agreement. (*Id.*) The agreement further expressly bars any claim by Puji to any equity if the Restricted Stock Award Agreement is not executed. (*Id.*) Under California law, Puji argues there are two theories under which there is a lack of consideration in the Business Collaboration Agreement. First, two conditions precedent, the Board's approval and the execution of the Restricted Stock Award Agreement, were not met, and therefore the contract never became enforceable. (D.I. 82 at 5). Second, the equity compensation offered by Plaintiff was an illusory promise, because Plaintiff could choose not to seek the Board's approval or not to execute the Restricted Stock Award Agreement. (*Id.*)

Here, the two conditions precedent were not performed. Puji argues that the failure to meet two conditions precedent to the formation of the contract renders the agreement unenforceable. (D.I. 82 at 5). Plaintiff argues that these two conditions were conditions to the issuance of stock to Puji, not conditions to the formation of the contract. (D.I. 88 at 13). Plaintiff cites to California case law that supports the

12

reasoning it argues here. In *Jacobs v. Freeman*, the California Court of Appeals found conditions of board approval to release the escrow from a property sale were intended to be conditions precedent to the "seller's duty to convey the title to the land rather than a condition precedent to the formation of a contract." 104 Cal. App. 3d 177, 189 (1980). Plaintiff has plausibly alleged similar facts to those in *Jacobs*. Thus, at this pleading stage, Plaintiff's claim can move forward.

Turning to the argument of an illusory promise, Puji argues Plaintiff's ability to choose to not seek approval from the Board or to not execute the Restricted Stock Award Agreement renders the agreement "devoid of all mutuality, for it would be leaving the existence of the contract to the will of one of the parties, which would be to say there was no contract at all." *Shortell v. Evans-Ferguson Corp.*, 98 Cal. App. 650, 660 (1929). At this stage, however, Plaintiff has alleged a claim that satisfies the pleading requirements. Plaintiff points to the California Civil Code, which provides that, "a written instrument is presumptive evidence of a consideration." CAL. CIV. CODE § 1614. Further, California courts have found that consideration to be paid at one party's discretion is enough to establish mutuality of obligation, based on the duty of good faith. *Larwin-S. Cal., Inc. v. JGB Inv. Co.*, 101 Cal. App. 3d 626, 640 (1979). As the Business Collaboration Agreement is governed by California law, Plaintiff's claims may not be dismissed.

Puji also argues that, even if the Business Collaboration Agreement is found to be an enforceable contract, Plaintiff failed to plead its own performance or excuse, breach of the agreement by Puji, and the existence of damages proximately caused by the breach. (D.I. 82 at 7). Puji's position that Plaintiff did not perform does not defeat Plaintiff's claims at this stage. Plaintiff claims it was "prepared to perform [the obligations] in due course," (D.I. 1 ¶ 123) and though Puji argues this statement is

conclusory, Plaintiff has alleged the timing of these actions remained at its discretion, without rendering that choice illusory. (D.I. 88 at 14).

Plaintiff also alleges Puji breached the Business Collaboration Agreement by failing to facilitate the launch of Plaintiff's product in China and the investment into Plaintiff from Jupai. (D.I. 1 ¶ 124). Puji argues the language of the Business Collaboration Agreement does not impose the specific duties Plaintiff alleges. (D.I. 82 at 7). But at this stage, Plaintiff's factual allegations are plausible, when considering the statement of facts contained in the complaint that recount the discussions and other communications surrounding the execution of the Business Collaboration Agreement. Finally, Puji argues Plaintiff cannot plead for damages caused by the breach because California law does not typically allow a new business to claim lost prospective profits due to uncertainty and lack of proof. (D.I. 82 at 7; citing *Macmorris Sales Corp. v. Kozak*, 263 Cal. App. 2d 430, 442-43 (1968)). Plaintiff does not request damages for lost profits in its Prayer for Relief, but compensatory damages, and those damages available pursuant to 6 Del. C. §2533(c). (D.I. 1 at 31). While it may be that a new business cannot receive damages for lost profits that is not a reason to dismiss the claim.

Thus, I deny Puji's motion to dismiss as to Count One.

### B. Count Two against PJ for breach of contract

Count Two is based on PJ's breach of the Stock Purchase Agreement, which is governed by Delaware law. (D.I. 1-2, Exh. B). The Stock Purchase Agreement provides the terms of the investment and exchange of the stock issuance to PJ. (*Id.*) The parties dispute whether the agreement formed an enforceable contract, due to the lack of an initial closing date specified in the document. (D.I. 78 at 5). PJ argues that the missing initial closing date, to which the execution of all terms are subject, indicates the agreement is missing essential terms, and therefore cannot be considered a binding enforceable contract. (*Id.*) Accordingly, PJ argues the claim of breach of contract should be dismissed. (*Id.*)

Alternatively, PJ argues that even if the Stock Purchase Agreement is found to be an enforceable contract, the inclusion of an "exculpatory clause" in the agreement prevents Plaintiff from imposing liability on PJ for not completing the investment. (*Id.*)[6] By contrast, Plaintiff argues that the lack of a specified initial closing date does not render the contract unenforceable, because the agreement was executed in April of 2017 with the intent of both parties to execute the terms of the agreement. (D.I. 88 at 22). Alternatively, Plaintiff argues the "exculpatory clause" only bars liability if PJ were not able to purchase the "full amount" of the total shares, not if PJ fails to purchase any at all. (*Id.*) I think the allegations in the complaint, taken as true, are sufficient at this stage to overcome PJ's argument for dismissal. Both cases PJ cites to as support for its motion, *Leonard v. University of Delaware*, 204 F.Supp.2d 784,787-88 (D. Del. 2002) (settlement agreement) and *In re Frederick's of Hollywood*, 2000 WL 130630, at *6-7 (Del. Ch. Jan. 31, 2000) (exculpatory clause), are not on point. The Stock Purchase Agreement is quite different from the agreements in the above-mentioned cases. In *Eagle Force Holdings, LLC v. Campbell*, the Delaware Supreme Court found that an agreement with an execution date left blank was sufficiently definite to state a claim. *Eagle Force Holdings, LLC v. Campbell*, 2018 WL 2351326, at *18 (Del. May 24, 2018). *Eagle Force* is much more relevant authority. Thus, I will deny PJ's motion to dismiss as to Count Two.

### C. Count Three against Jupai for breach of contract

Count Three is based on breach of the Term Sheet, which is governed by California law. (D.I. 31, Exh. 1). Jupai argues the Term Sheet does not form a binding or enforceable contract and thus cannot be breached. (D.I. 81 at 5-6). The Term Sheet provided the proposed terms for Jupai's investment into

---

[6] The clause in question reads: "Notwithstanding anything to the contrary set forth herein, no Initial Purchaser shall have any liability to the Company or any third party for its failure to purchase the full amount of its Total Share Commitment by the Outside Funding Date for any reason." (D.I. 1-2, Exh. B at 2).

Plaintiff. (D.I. 1 ¶ 132). The document was signed by Plaintiff and "stamped" by Jupai. (*Id.*) Plaintiff claims the Term Sheet constituted a binding promise from Jupai to invest in Plaintiff, and that Jupai breached the contract when it failed to fund the investment. (*Id.*) Accordingly, Plaintiff argues the agreement provides that the terms would be memorialized in a formal binding writing, the Stock Purchase Agreement. (D.I. 88 at 17). Plaintiff points to California contract law, which states that "negotiations [oral or written terms] ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend that a formal writing embodying these terms shall be executed later." *Pac. Grove-Asilomar Operating Corp. v. County of Monterey*, 43 Cal. App. 3d 675, 686 (1974). The Term Sheet, however, in the introductory paragraph, states it "constitutes a non-binding obligation or commitment ..." and that the "definitive terms and obligations between parties are subject to executed investment agreements." (D.I. 31, Exh. 1 at 4). California law holds that if the language of the agreement is clear, the language must govern the interpretation of the agreement. *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 662 (9th Cir. 2012). The non-obligation clause and the postponement of binding terms to future agreements means that the Term Sheet cannot be considered a binding agreement.

Thus, I grant Jupai's motion to dismiss as to Count Three.

### D. Count Four against all Defendants for breach of implied covenant of good faith and fair dealing

All Defendants move to dismiss Count Four, for breach of the implied covenant of good faith and fair dealing. Plaintiff's claims against each Defendant are based on each of their respective agreements. Under California law, which governs the Term Sheet agreement between Jupai and Plaintiff, the covenant of good faith is "an implied term of a contract, [and thus] the existence of a contractual relationship is prerequisite for any action for breach of contract." *Scott v. Solano County Health &*

16

*Social Services Dept.*, 459 F.Supp.2d 959, 967 (E.D. Cal. 2006); *Smith v. City and County of San Francisco*, 225 Cal.App.3d 38, 49 (1990). Because I find the Term Sheet agreement between Jupai and Plaintiff is not a binding agreement, I will grant Jupai's motion to dismiss as to Count Four.

In the claim against Puji based on the Business Collaboration Agreement, Puji argues primarily that there is no contractual relationship with Plaintiff. Because I have denied Puji's motion to dismiss for breach of the Business Collaboration Agreement, I will analyze this claim assuming that there is a contractual relationship between the two parties.

The complaint alleges that Puji breached the implied covenant by making false statements and frustrating Plaintiff's right to receive the benefits of the agreement, specifically by the intentional interference into Plaintiff's business relationship with OurCam. (D.I. 1 ¶ 141; D.I. 88 at 24). As will be discussed in the following sections, Plaintiff's claim in Count Six against Puji for interference with OurCam will be dismissed. Thus, the interference theory is not grounds for alleging breach of the implied covenant. Plaintiff also argues that Puji's false representations about the status of the investment constitute a breach of the implied covenant. Under California law, which governs the Business Collaboration Agreement, allegations of the breach of the implied covenant may not stand alone as independent claims if they are duplicative of the breach of contract claim. *Shaterian v. Wells Fargo Bank, N.A.,* 829 F.Supp.2d 873, 884 (N.D. Cal. 2011). As an exception to this principle, claims of breach of the implied covenant may be considered valid claims if the allegations plead the "defendant acted in bad faith to frustrate the contract's actual benefits." *Id.* Because I think Plaintiff has alleged sufficient facts about Puji's false representations to Plaintiff about the status of the investment, I will deny Puji's motion to dismiss as to Count Four.

Finally, Plaintiff's claim against PJ is based on the Stock Purchase Agreement, which is governed by Delaware law. PJ argues the complaint's allegations of breach of the implied covenant go no further than the allegations of breach of contract. (D.I. 78 at 11). Delaware courts have found that allegations of breach of the implied covenant do not apply when the conduct is also addressed by breach of contract allegations. *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.2d 878, 896 (Del. 2015). While Plaintiff attempts to assert the complaint falls in the small window of opportunity that allows breach of the implied covenant claims where the conduct "frustrate[d] the overarching purpose of the contract," I think the allegations fall short. *See Gerbitz v. ING Bank, FSB*, 967 F.Supp.2d 1072, 1081 (D. Del. 2013). Plaintiff contends that PJ's email to Plaintiff disclaiming liability to fulfill the terms of the investment in response to Plaintiff's demand letter is a breach of the implied covenant. But that contention is the same as the breach of contract claim that PJ did not make the investment. In addition, the email response was the last course of conduct taken by either party immediately before Plaintiff filed this action. It makes no sense to say that a communication sent in response to Plaintiff's letter threatening legal action, denying liability, constitutes conduct done to frustrate the overall purpose of the contract. Thus, I will grant PJ's motion to dismiss as to Count Four.

### E. Count Five against Puji and Jupai for intentional interference with contractual relations

Plaintiff claims Puji and Jupai were aware of the contractual obligations contained in the Stock Purchase Agreement between Plaintiff and PJ, and took intentional steps to prevent Plaintiff from receiving the benefits of the contract and/or PJ from fulfilling its obligations. (D.I. 1 ¶¶ 146-47). In order to successfully prove an intentional interference with contractual relations, a plaintiff must prove: 1) a valid contract existed, 2) defendant had knowledge of the contract, 3) defendant acted intentionally in a manner that was a significant part of the breach, 4) actual breach occurred without justification, and 5)

18

plaintiff was injured by the defendant's actions. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 605 (Del. Ch. 2010); *Tenneco Automotive, Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007); *United Nat'l Maint., Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014).

Both Puji and Jupai argue they are exempt from liability because they are not strangers to the contract. They argue they are affiliates to the contract, and thus shielded from liability by the affiliate privilege doctrine. I agree with Puji and Jupai here.

Delaware law protects parties or enterprises from liability for tortious interference if they are affiliated with the contract and/or the contracting parties by common ownership or shared economic interests. *AM General Holdings LLC v. Renco Group, Inc.*, 2013 WL 5863010, at *12 (Del. Ch. Oct. 21, 2013). Only where the affiliate party acts in accordance with the "stringent bad faith standard" can liability for this tort be established. *Id.* Plaintiff argues that Puji and Jupai are strangers to the contract for purposes of this Count, but considering that the complaint as a whole is premised on the closeness of the relationship between all three entities, that argument cannot hold up.

Alternatively, under California law, it may be that the stranger requirement is not as strict. (D.I. 101 at 77). California courts have held that "liability for this tort [intentional interference with economic relations] exists to protect the parties to that relationship from 'interference by a stranger to the agreement." *United Nat'l Maint., Inc.*, 766 F.3d at 1007. Further explanation of this doctrine was provided by the California Supreme Court, however, when that Court held that a plaintiff must prove not only intentional interference, but "conduct that was wrongful by some legal measure other than the fact of interference itself" as well. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). Plaintiff states its claim for intentional interference "does not rely on allegations of fraud." (D.I.

19

88 at 30). Because Plaintiff does not allege that Puji and Jupai's actions were wrongful on some other basis, Plaintiff's allegations are not sufficient to claim intentional interference.

Because Puji and Jupai are affiliates to PJ and the contract, and because Plaintiff does not allege Puji and Jupai acted in accordance with the stringent bad faith standard, I will grant Puji and Jupai's motion to dismiss as to Count Five.

### F. Count Six against Puji for intentional interference with prospective economic relations

Plaintiff also brings a claim against Puji for intentional interference with prospective economic relations based on Puji's communications with Plaintiff's potential acquisition target, OurCam. (D.I. 1 ¶ 152). Plaintiff contends Puji, while aware of the potential partnership and/or acquisition between Plaintiff and OurCam, represented to OurCam that the investment from Jupai into Plaintiff was moving slowly. (*Id.* ¶ 50). Further, Puji told OurCam that it should "give up" on a partnership with Plaintiff. (*Id.*). Plaintiff alleges these representations were wrongfully and intentionally false. (*Id.* ¶ 152).

In order for Plaintiff to prove Puji intentionally interfered in this regard, Plaintiff must first allege: 1) an economic relationship between Plaintiff and OurCam with the probability of future economic benefit to Plaintiff, 2) Puji's knowledge of the relationship, 3) intentional acts by Puji designed to disrupt the relationship, 4) actual disruption of the relationship, and 5) economic harm done to Plaintiff, proximately caused by Puji's acts. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).

More importantly, however, Plaintiff must allege the independent act of making these representations to OurCam was wrongful or unlawful, in other words, that the independent act was "proscribed by some constitutional, statutory, regulatory, common law, or other determinable standard." *Id.* at 1159. Plaintiff claims that at the same time Puji communicated with OurCam, Puji communicated

20

to Plaintiff that the investment was still on track. (D.I. 88 at 35). Based on the facts contained in the complaint, it appears that the investment was in fact moving slowly. (D.I. 1). However, assuming the representations were false at the time they were made, Plaintiff points to no standard or law that prohibits the nature of the communication from Puji to OurCam. It may be alleged to be false, but there is no allegation it was unlawful. Therefore I will grant Puji's motion to dismiss as to Count Six.

### G. Count Seven against Puji for breach of fiduciary duty

Plaintiff claims Puji breached a fiduciary duty owed to Plaintiff, based on Plaintiff and Puji's business relationship, summarized in the Business Collaboration Agreement. (D.I. 1 ¶ 157). Plaintiff argues the nature of the relationship between Plaintiff and Puji, as well as its reliance on Puji's "advice and guidance on key business matters," formed a fiduciary relationship that was breached when Puji failed to deliver on its promises. (*Id.*) The Business Collaboration Agreement is governed by California law. The elements for breach of fiduciary duty under California law are as follows: 1) fiduciary duty exists, 2) breach of that duty, and 3) damage to the plaintiff resulting from the breach. *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 524 (2015).

Plaintiff argues a special relationship exists with Puji based on the terms summarized in the Business Collaboration Agreement. (D.I. 1 ¶ 157). Although Plaintiff received guidance and advice from Puji, I do not find this creates a fiduciary duty.

California case law states that an agreement between two parties, where one party may have superior knowledge and expertise relative to the subject of the agreement, does not create a fiduciary duty. *City of Hope National Medical Center v. Genentech*, 43 Cal. 4th 375, 389 (2008). Further, it is not "unusual for a party to enter into a contract for the very purpose of obtaining the superior knowledge or expertise of the other party." *Id.* That is what Plaintiff was doing in this case. The Business

21

Collaboration Agreement states, "The parties recognize ... there may be mutually beneficial business objectives that can be achieved through their collaboration...." (D.I. 1-1, Exh. A at 2). In this way, the relationship is similar to the contract in which the court found there was no fiduciary duty created where both parties entered into a mutually beneficial contract. *City of Hope National Medical Center*, 43 Cal. 4th at 389.

Thus, for the purpose of analyzing Count Seven, the Business Collaboration Agreement documented a relationship in which each party would exchange valuable consideration. Puji is alleged to have been in a position of superior knowledge, but this fact alone cannot make Puji a fiduciary to Plaintiff. Therefore, I will grant Puji's motion to dismiss as to Count Seven.

### H. Count Eight against all Defendants for intentional misrepresentation

Plaintiff alleges all Defendants made false and intentional misrepresentations on which Plaintiff reasonably relied, and thus suffered substantial harms as a result. (D.I. 1 ¶¶ 161-65). In order to claim intentional misrepresentation, Plaintiff must plead these elements of fraud with particularity: 1) misrepresentation, 2) knowledge of the misrepresentation, 3) intent to defraud or induce Plaintiff to act or refrain from acting, 4) Plaintiff's justifiable reliance upon the representation, and 5) resulting damages. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004); *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586-87 (Del. 2008).

In response to the claim against it and for the purposes of this motion, Puji concedes that the complaint does allege a list of statements and/or communications made to Plaintiff on behalf of Puji. (D.I. 82 at 16). But, Puji argues that there are no particular facts alleged that indicate Puji was aware the statements were false, or that Puji had an intent to defraud Plaintiff. (*Id.*) Puji points to two instances where it claims Plaintiff chose to ignore Puji's advice to avoid focusing all of its resources on one

22

potential investment source, and to seek additional funding elsewhere. (*Id.*). Moreover, Puji argues Plaintiff does not allege its scienter with enough specificity, but as Plaintiff notes, Rule 9(b) only requires the factual circumstances of the fraud be alleged with particularity; the mental state may be alleged generally. Fed. R. Civ. P. 9(b).

Plaintiff argues that Puji admitted the falsity of some of the representations it made in the email response to Plaintiff's demand letter. (D.I. 88 at 25; D.I. 1-5, Exh. E). This includes the statement in the email that neither Jupai nor PJ raised money in connection with the proposed investment. (*Id.*) While Plaintiff admits the email does not substantiate all of the false representations it claims Puji made, Plaintiff here pleads with enough particularity that at least some of the statements Puji made were false. Plaintiff also sufficiently pleads that it reasonably relied on Puji's statements by choosing to pursue this investment with Jupai based on arguably credible statements about the status of the investment at the time the statements were made. At this pleading stage, Plaintiff does not have to allege how Puji knew its representations were false, only that Puji made representations to Plaintiff that were factually different than what Puji knew to be true. Because Plaintiff satisfies that pleading requirement, I will deny Puji's motion to dismiss as to Count Eight.

Against Jupai and PJ however, Plaintiff's claim of intentional misrepresentation falls short. Even viewed in the light most favorable to the Plaintiff, Plaintiff does not argue Jupai or PJ made representations about the status of the investment prior to or immediately following the execution of the Stock Purchase Agreement. (D.I. 88 at 26-28). Both Jupai and PJ contend that Plaintiff has not pled specific allegations of fraud against each defendant with the requisite particularity. (*Id.*).[7] Plaintiff

---

[7] Jupai specifically points to both Delaware and California case law that finds plaintiffs must plead, with the required particularity, allegations of fraud against each individual defendant. *Sandvik AB v. Advent Int'l Corp.*, 83 F.Supp.2d 442, 448 (D. Del. 1999); *Kronk v. Landwin Grp., LLC*, 2011 WL 13143096, at *6 (C.D. Cal. June 7, 2011).

23

primarily relies on representations made by Puji about PJ and Jupai's involvement. The only specific

allegation involving PJ and Jupai is PJ's email response to the demand letter, which happened after

Plaintiff threatened legal action. [8] Neither PJ nor Jupai made earlier representations about the status of

the investment that Plaintiff has alleged with specific facts were false at the time the statements were

made.[9] For the purposes of this opinion, I assume without deciding that the demand letter sent from

Plaintiff to Jupai (D.I. 1-4, Exh. D) and the email response to the demand letter sent from PJ (D.I. 1-5,

Exh. E), are not made inadmissible by Rule 408 of the Federal Rules of Evidence.

Thus, I will grant Jupai and PJ's respective motions to dismiss as to Count Eight. I will deny

Puji's motion to dismiss as to Count Eight.

## I. Count Nine against all Defendants for violation of the Delaware Deceptive Trade Practices Act

In its final claim, Plaintiff alleges all three Defendants violated the Delaware Deceptive Trade

Practice Act, 6 Del.C. §2532. (D.I. 1 ¶¶ 167-68). Because the claims against Defendants are all based on

the same allegations, I will analyze the argument against each as a whole. Plaintiff, Jupai, and Puji argue

in their briefing about whether the Deceptive Trade Practices Act can apply to injurious conduct that

does not physically take place in the state of Delaware. (D.I. 81, 82, 88). There is some case support

offered by Defendants that the Deceptive Trade Practices Act is not available to litigants who cannot

show any evidence of wrongful conduct or injury taking place in Delaware. *See Guidance Endodontics,*

*LLC v. Dentsply Int'l, Inc.*, 663 F.Supp.2d 1138, 1155 (D.N.M. 2009). Plaintiff points out that *Guidance*

---

[8] The email response letter from Oreans Yuan, acting on behalf of PJ, was the last communication between Plaintiff and any of Defendants before the complaint was filed. Thus, Plaintiff cannot claim it reasonably relied on this email response in any of the choices it made with regards to its decision to pursue the Jupai investment. (D.I. 78 at 13).
[9] It is not surprising that Plaintiff has not made such allegations. As Plaintiff candidly stated at oral argument, Plaintiff's theory is that Defendants intended to make the investment until some point in time when Defendants changed their mind.

*Endodontics* dealt with a party incorporated in Delaware. (D.I. 88 at 37). Here, as Plaintiff argues, there is a lack of Delaware case law regarding this specific issue.

However, I do not need to decide whether the Act can apply if the actions and injury did not take place in Delaware, because Plaintiff is unable to meet one of the other requirements for standing under the Act. Though Plaintiff cites to language in the statute that reads, "[in] order to prevail in an action under this chapter, a complainant need not prove competition between the parties...." 6 Del. § 2532(b), Delaware courts have consistently held that the purpose of the DTPA is to protect horizontal relationships. The Delaware Supreme Court, based on their "review of the statute, legislative intent, and context of the Deceptive Trade Practices Act with regard to its sister provision, the Consumer Fraud Act," held that a litigant only has standing to bring a claim under this law if it has a horizontal relationship with the other party. *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del. 1993). In short, Delaware courts have defined horizontal relationships as ones where the two parties are in direct competition with each other. *Livery Coach Solutions, LLC v. Music Express/East, Inc.*, 245 F.Supp.3d 639, 648 (D. Del. 2017).[10]

The nature of the relationship between Plaintiff and all three Defendants is not one of competition, but consists of advising, facilitating, and supporting an investment in exchange for shares. There is no horizontal relationship between Plaintiff and any of the three Defendants. Thus I will grant Puji, Jupai and PJ's respective motions to dismiss as to Count Nine.

---

[10] More specifically, the court in *Livery Coach Solutions* adopted the definition of horizontal relationships from *Chase Bank USA, N.A. v. Hess*, 2013 WL 5314706, at *5 (D. Del. Sep. 20, 2013), which held that a horizontal relationship "exists between at least two businesses on the same market level, because they manufacture similar products in the same geographic region, or are direct competitors." *Livery Coach Solutions*, 245 F.Supp.3d at 648.

## IV. CONCLUSION

For the reasons stated above, Jupai's motion to dismiss, pursuant to Rule 12(b)(2) for lack of personal jurisdiction (D.I. 80), is **DENIED**. Puji's motion to dismiss, pursuant to Rule 12(b)(6) (D.I. 79) as to Counts One, Four, and Eight, is **DENIED**. PJ's motion to dismiss, pursuant to Rule 12(b)(6) (D.I. 77) as to Count Two, is **DENIED**. Except as just noted, the remaining motions to dismiss, pursuant to Rule 12(b)(6) (D.I. 77, 79, 80), are otherwise **GRANTED**.

As requested (D.I. 88 at 53), Plaintiff is **GRANTED** leave to amend its complaint within two weeks.

Entered this _30_ day of July, 2018.

United States District Judge